UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CERTAIN UNDERWRITERS AT LLOYD'S LONDON
ET AL.,

                                    Petitioners,

              -v-

EDOUCH ELSA INDEPENDENT SCHOOL DISTRICT,

                                    Respondent.

23 Civ. 8957 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision appoints a neutral arbitrator in an insurance coverage dispute.  After

incurring hurricane damage to various of its Texas properties, respondent Edcouch Elsa

Independent School District (the "School District") seeks insurance coverage under a policy with

the petitioners, who are insurers (the "Insurers").  Under the parties' arbitration agreement, the

two party-appointed arbitrators are to appoint an umpire to resolve disputes between them; if

they cannot agree upon an umpire, a judge of a New York court may select one.  After the party-

appointed arbitrators proved unable to agree upon an umpire, the Insurers filed a petition (the

"Petition") asking this Court to designate and appoint an umpire under the agreement and

Section 5 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 5.  The Insurers propose three

candidates—all former magistrate judges of this District.

The School District has now moved to dismiss the Petition for lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Alternatively, the School District

requests that the Court select one of its four proposed candidates.  For the reasons that follow,

the Court denies the motion to dismiss, grants the Petition, and designates and appoints Michael

H. Dolinger, a former United States Magistrate Judge in this District, as umpire.

I.      **Background**

The School District serves public schools in the Rio Grande Valley of Texas.  Dkt. 18 at

1.  In July 2020, Hurricane Hanna hit the region, causing damage to the School District's

buildings, campuses, and other structures.  Dkt. 22 ("Pet.") ¶ 20.[1]  The School District was

insured by petitioners, who are insurance companies or, in the case of Certain Underwriters at

Lloyd's, London, an "unincorporated association and/or limited partnership" comprised of

individual underwriters who insure risk.  *Id.* ¶¶ 1–11.  The School District filed claims under its

Commercial Property Insurance Policy (the "Policy") with Insurers.  *Id.* ¶ 20.  The parties,

however, dispute the extent of coverage to which the School District is entitled under the Policy.

*Id.* ¶ 21.

The Policy contains an arbitration agreement (the "Arbitration Agreement") requiring the

arbitration of disputes.  *See* Dkt. 5 ("Greisman Decl.") at 2–3; *see also id.*, Ex. A ("Ins. Policy")

at 48.  Pursuant to that agreement, the parties submitted their dispute to arbitration.[2]  Central

here, the Arbitration Agreement provides that:

> Unless the parties agree upon a single Arbitrator within thirty days of one receiving
> a written request from the other for Arbitration, the Claimant (the party requesting
> Arbitration) shall appoint his Arbitrator and give written notice thereof to the
> Respondent.  Within thirty days of receiving such notice, the Respondent shall
> appoint his Arbitrator and give written notice thereof to the Claimant, failing which
> the Claimant may nominate an Arbitrator on behalf of the Respondent.
>
> Should the Arbitrators fail to agree, they shall appoint, by mutual agreement only,
> an Umpire to whom the matter in difference shall be referred.  If the Arbitrators
> cannot agree to an Umpire, either may request the selection be made by a judge of
> a New York court.

---

[1] The original Petition was filed at Docket 1, but a revised petition that corrected grammatical
and typographical errors was filed at Docket 22.  The Court refers to the latter as "the Petition."

[2] *See* Ins. Policy at 48 ("All matters in difference between the Insured and the Companies [] in
relation to this insurance . . . shall be referred to an Arbitration Tribunal in the manner
hereinafter set out.").

*Id.* Unable to agree upon a single arbitrator, the parties thus each appointed a party arbitrator, pursuant to the Arbitration Agreement's alternative tripartite arbitral panel structure. The School District appointed former Texas state district judge Carl H. Ginsberg. Pet. ¶ 22. The Insurers appointed Stephen M. Rogers, of Stephen M. Rogers, LLC.[3] *Id.*

Beginning August 2023, the party-appointed arbitrators attempted, but failed, to agree upon an umpire. *Id.* ¶ 23. Ginsberg proposed a Texas-based umpire; Rogers proposed a New York-based umpire. *Id.* ¶¶ 24, 27. In August, Rogers proposed three candidates, each a former United States Magistrate Judge from this District presently affiliated with the alternative dispute resolution organization Judicial Arbitration and Mediation Services ("JAMS"): Michael H. Dolinger; Henry B. Pitman; and Kathleen A. Roberts. *Id.* ¶ 24. Ginsberg objected to each on account of the JAMS affiliation. He proposed three candidates: retired Texas state court judges Mark D. Davidson and Deborah G. Hankinson; and Paul J. Van Osselaer, a Texas-based attorney and mediator/arbitrator. Pet. ¶ 27.

Rogers, rejecting Ginsberg's candidates, then suggested three candidates unaffiliated with JAMS: Christopher F. Droney, a retired Second Circuit judge; James M. Orenstein, a retired United States Magistrate Judge from the Eastern District of New York; and David W. Ichel. Ginsberg rejected these candidates and proposed that the umpire be from a "neutral" state (not Texas or New York). Pet. ¶ 28 n.2. He proposed five Florida-based candidates: Joseph T. Halbach, a retired Florida state district judge; Jerald Bagley and Victor Tobin, both retired Florida state circuit judges; John J. Pappas; and Curtis Hutchens. Pet. ¶ 29. Rogers rejected

---

[3] The Insurers' original party-appointed arbitrator was Courtney Murphy, a partner at Hinshaw & Culberton, LLP in New York. On August 3, 2023, Rogers succeeded her. Pet. ¶22 n.1.

these candidates as inconsistent with the Arbitration Agreement, which states that the "[t]he seat of the Arbitration shall be in New York and the Arbitration Tribunal shall apply the law of New York as the proper law of this insurance." Ins. Policy at 48; *see* Pet. ¶ 26.

On October 13, 2023, the Insurers filed the Petition. It seeks this Court's appointment of an umpire, pursuant to the Arbitration Agreement. The Petition states that "the parties have reached an impasse" in the selection of an umpire. Pet. at p. 1.

## II.   Procedural History

On October 13, 2023, the Insurers filed the Petition, Dkt. 1, a memorandum of law, Dkt. 3 ("Pet. Mem."), and a declaration, Dkt. 5, in support. On October 17, 2023, the Court ordered the Insurers to serve the School District forthwith. The Court further ordered the parties to file a joint letter addressing whether the Court could resolve the dispute based on the petition and the School District's response, or whether additional submissions were warranted. Dkt. 11. On October 30, 2023, the parties filed a joint letter stating that the Court could resolve the motion on the briefs. Dkt. 14. Agreeing, the Court set a briefing schedule. Dkt. 15. On November 13, 2023, the School District filed a memorandum moving to dismiss for lack of jurisdiction and alternatively opposing the Petition. Dkt. 18 ("Resp. Mem."). On November 29, 2023, Insurers filed a reply. Dkt. 19 ("Pet. Reply").

## III.   Motion to Dismiss

The School District first moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of jurisdiction, arguing that it is immune from suit under the Eleventh Amendment.

### A. Applicable Legal Standards

#### 1. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (citation omitted). A court may properly refer to matters outside the pleadings when considering the existence of jurisdiction on a motion pursuant to Rule 12(b)(1). *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986).

#### 2. Eleventh Amendment

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment "generally bars suits in federal court by private individuals against non-consenting states." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citation omitted).

"This immunity from suit encompasses not just actions in which a state is actually named as a defendant, but also certain actions against state agents and instrumentalities, including actions for the recovery of money from the state." *Id.* (citations omitted). The question is whether the state instrumentality is independent or an "arm of the state." *Alden v. Maine*, 527

U.S. 706, 756 (1999). Eleventh Amendment immunity does not extend to "suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State," but it does extend to "a state agency." *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006).

The Supreme Court has not articulated a decisive standard for whether a state entity is an "arm of the state" entitled to Eleventh Amendment immunity. It instead has stated that "the Eleventh Amendment's twin reasons for being"—preserving the state's treasury and protecting the integrity of the state—"remain our prime guide." *Hess v. PATH*, 513 U.S. 30, 47–48 (1994). The Second Circuit has used two tests to resolve this question.

The first is the two-factor test articulated in *Clissuras v. City University of New York*, 359 F.3d 79 (2d Cir. 2004). Under it, a court considers: "(1) the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity, and (2) the degree of supervision exercised by the state over the defendant entity." *Id.* at 82 (citations and internal quotation marks omitted).

The second is the six-factor test articulated in *Mancuso v. New York State Thruway Authority*, 86 F.3d 289 (2d Cir. 1996). Under it, a court considers: "(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state." *Id.* at 293. "If all six factors point in one direction, the analysis is complete." *Leitner*, 779 F.3d at 135. If not, a court is to analyze the twin aims of the Eleventh Amendment as articulated by the Supreme Court.

In the end, "the tests have much in common, and the choice of test is rarely outcome-determinative." *Id.* at 137.  Under each, "the party asserting Eleventh Amendment immunity []
bear[s] the burden of demonstrating entitlement." *Id.* at 134.

## B.  Discussion

In evaluating the School District's claim of Eleventh Amendment immunity, the Court
first applies the *Clissuras* factors and then the *Mancuso* factors.  Under either test, the Court
finds the School District not an arm of the state and hence not entitled to immunity.[4]

### 1.  *Clissuras* Test

The first and "most important" *Clissuras* factor inquires "whether a judgment against the
entity must be satisfied out of a State's treasury." *Id.* at 137.

The Insurers argue that this action is not a suit against the School District in which a
money judgment against it is sought.  That is correct.  The Insurers seek only the appointment of
an umpire, which would not occasion a "judgment against the [School District]" that must be
satisfied out of the state's treasury.  *Id.*  The School District counters that "the judgment" that the
Court may order could include the "fee associated with the arbitral chair." Resp. Mem. at 7.  But
that is wrong.  The Petition does not seek, as relief, an order to pay fees associated with the
umpire.  Nor could it properly do so.  Under the Arbitration Agreement, any order to that effect
would be for the arbitral panel to issue.  *See* Ins. Policy at 48 ("Each party will pay its chosen
Arbitrator, and also bear the other expenses of the Arbitration and Umpire equally.").[5]  And any

---

[4] The Insurers separately oppose the motion to dismiss on the grounds that (1) the School District
expressly agreed to jurisdiction by a New York court and thus waived immunity; and (2) this
proceeding is not a "suit," such that the Eleventh Amendment does not apply.  Because the Court
finds the School District is not an "arm of the state," it does not reach these arguments.

[5] For this reason, the School District's observation that the umpire fees would ultimately "be paid
'from the funds the legislature specifically appropriates to pay the fee or reimburse the
expense,'" Resp. Mem. at 7 (citing Tex Gov't Code § 2254.108), is of no moment.

such order calculating, or directing the payment of, arbitral fees could issue only *after* the arbitral panel, having been constituted, resolves the insurance-coverage dispute presented by the School District's claim. The limited issue before this Court is the threshold one of whom to appoint as umpire. Because the Petition does not seek and this Court will not order the payment of any fees, there will be no judgment against the School District arising from this lawsuit that must be satisfied out of the State's treasury. *See, cf., Russell v. Dunston*, 896 F.2d 664, 668 (2d Cir. 1990) (suit against state official not barred by Eleventh Amendment where plaintiff "does not seek monetary relief" and only seeks prospective relief in the form of "an injunction requiring the defendant state officials to reinstate him to his medical leave status"); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1986), *modified*, 793 F.2d 457 (2d Cir. 1986) ("[A]n order that reinstatement be granted or that a reinstatement hearing be conducted is the sort of prospective relief that is not barred by the Eleventh Amendment."); *Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) (Eleventh Amendment does not bar claims brought against state official in individual capacity because "Eleventh Amendment does not bar award of damages to be paid not from the state treasury but from the official's personal funds").

Even if the School District's bid did not falter on the threshold ground that this limited-purpose litigation will not result in a monetary judgment against it, its claim of immunity on the ground that the State of Texas is necessarily responsible for judgments against it is flawed. The School District emphasizes that nearly 78% of its funding comes from the State of Texas.[6] Resp. Mem. at 7. But the Second Circuit has "repeatedly held that a school [district's] receipt of funds

---

[6] For the 2020–2021 school year, the School District's funding was comprised of local property taxes (7.76%); state operating funds (77.68%); federal funds (12.29%); and "other local" sources (2.27%). *See* Texas Education Agency, *2020–2021 Actual Financial Data Totals for Edcouch-Elsa ISD (108903)*, https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_service= appserv&_debug=0&_program=sfadhoc.actual_report_2021.sas&who_box=&who_list=108903.

from state appropriations is not equivalent to satisfaction of a judgment against [it] from the state treasury." *Leitner*, 779 F.3d at 138. Here, the School District has not shown that a judgment against it would necessarily be satisfied by funds from the state treasury.

To the contrary, under Texas law, independent school districts have significant power to self-finance. Like counties and cities, such districts have the power to levy and collect taxes and issue bonds, Tex. Educ. Code §§ 11.152, 11.1511; and they may acquire, hold, and sell real and personal property, *id.* §§ 11.154–.156. In light of this funding structure, the Supreme Court of Texas and the Fifth Circuit have held that Texas independent school districts are not protected by the Eleventh Amendment. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. McKinney*, 936 S.W.2d 279, 284 (Tex. 1996) (holding San Antonio Independent School District amenable to suit in federal court under Eleventh Amendment in part because a "judgment against [it] must be paid from the funds of the school district, whether generated locally or appropriated by the State, not from the state treasury"); *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 183 (5th Cir. 2023) (holding McAllen Independent School District not an arm of the state and not entitled to Eleventh Amendment immunity, in part because "a judgment against [the school district] would not fall upon Texas" as the district "receives significant funding from non-state sources" and has "the power to levy certain taxes and to issue bonds"); *Springboards to Educ., Inc. v. Mission Indep. Sch. Dist.*, No. 21-40337, 2023 WL 3094185, at *2 (5th Cir. Apr. 26, 2023) (holding Mission Independent School District not an arm of the state for purposes of Eleventh Amendment and not entitled to immunity even though "it depends on the state for roughly 72% of its funding"); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 596 (5th Cir. 2006) ("Generally, school boards and districts are not arms of the state shielded by Eleventh Amendment immunity."). This first *Clissuras* factor disfavors Eleventh Amendment immunity.

The second factor inquires whether the state has "ultimate control" over how the entity is governed and operated. *Clissuras*, 359 F.3d at 82. Texas undeniably exercises significant control over an independent school district. However, the Court finds that it does not exercise *ultimate* control over the School District, because the district's governing body is elected by local voters.

The Supreme Court of Texas and the Fifth Circuit have expressed differing views on the level of independence enjoyed by independent school districts. In *San Antonio Independent School District v. McKinney*, 936 S.W.2d 279 (Tex. 1996), the former found that "independent school districts enjoy a large amount of political autonomy from the State," *id.* at 282 (citing Tex. Educ. Code §§ 11.051–.063). Such districts, it noted, have the "primary responsibility for implementing the [S]tate's system of public education and ensuring student performance in accordance with [the Texas Education] [C]ode." *Id.* at 283 (citing Tex. Educ. Code § 11.002). Each district is governed by "a board of trustees elected by voters within a trustee district." *Id.* at 282 (citing Tex. Educ. Code §§ 11.051–.063). Further, trustees are granted "the exclusive power and duty to govern and oversee the management of the public schools of the district. All powers and duties not specifically delegated by statute to the [Texas Education Agency ("TEA")] or to the State Board of Education are reserved for the trustees." Tex. Educ. Code § 11.151(b). Trustees may adopt any rules or bylaws necessary to carry out their statutory powers and duties. *Id.* § 11.151(d). And the TEA "may not substitute its judgment for the lawful exercise of those powers and duties by the trustees." *Id.* § 11.151(b).

More recently, however, the Fifth Circuit, analyzing "the entity's degree of local autonomy," found that factor to "weigh[] in favor of immunity because Texas exerts considerable oversight and control over its school districts." *McAllen Indep. Sch. Dist.*, 62 F.4th

at 184. As the Fifth Circuit explained, the "[s]chool districts are subject to state accreditation, as well as academic performance and financial accountability standards, and Texas can take corrective action for any failure to comply." *Id.* (citing Tex. Educ. Code § 39A.001).   And "Texas can close a noncompliant district and annex it to an adjoining district." *Id.* (citing Tex. Educ. Code § 39A.001).   Finally, "Texas also has significant influence over the day-to-day operations of school districts, as it controls to varying degrees matters like school curriculum and student transportation." *Id.* (citing Tex. Educ. Code § 28.002; *id.* §§ 34.002–.003).

Although arguments in either direction can fairly be made as to this factor, the Court, applying the analytic approach endorsed by the Second Circuit, finds it to modestly disfavor immunity, because the State of Texas does not ultimately control the School District.   The School District, through its board of trustees, exercises significant political control independent from the State.   The trustees are elected by local voters within the district, and thus are primarily accountable to those voters, not the State.   The Second Circuit, analyzing this factor in *Leitner*, a case involving a community college, found it significant that New York's governor appointed only "four of [the college's] ten board members, while the Westchester County Board appoints five members and [the college's] student body elects one member." 779 F.3d at 138.   The Circuit found that the "balance between state and local appointment" further weighed against immunity because the community college had "not met its burden of demonstrating such effective [state] control over board decision-making." *Id.* 138–39.   Here, *no* trustee is appointed by the Texas governor (or by any other state official).   As such, the Court finds, the School District has not met its burden of demonstrating that the State of Texas exercises ultimate control over the board of trustees.

Because both factors under the *Clissuras* test disfavor immunity, the School District is not entitled to Eleventh Amendment immunity under that test.

### 2. *Mancuso* Test

The six *Mancuso* factors yield the same conclusion.

The first factor inquires "how the entity is referred to in the documents that created it." *Mancuso*, 86 F.3d at 293. As noted, Eleventh Amendment immunity does not extend to a "municipal corporation," or a "political subdivision" of the state, or "units of local government, such as cities and counties." *Woods*, 466 F.3d at 243. And Texas law explicitly identifies a "school district" as a "political subdivision of this state," like its cities and counties. Tex. Civ. Prac. & Rem. Code § 101.001(3)(B) (defining "a political subdivision of this state" to include "any city, county, *school district* . . ."). School districts, like cities and counties, are defined as "political subdivisions," as opposed to "the several agencies of government that collectively constitute the government of [Texas] state." *Id.* § 101.001(3)(A). This factor thus disfavors immunity. *See McKinney*, 936 S.W.2d at 283 (Texas law categorizes school districts as political subdivisions of the state, not as state agencies).

The second factor inquires "how the governing members of the entity are appointed." *Mancuso*, 86 F.3d at 293. As noted, an independent school district "is governed by a board of trustees." Tex. Educ. Code § 11.051(a). All trustees are elected by voters of that district, *id.* § 11.054, serving "a term of three or four years," *id.* § 11.059(a). Because the trustees are not appointed by the governor or other state official, this factor disfavors immunity.

The third factor inquires "how the entity is funded." *Mancuso*, 86 F.3d at 293. For the 2020–2021 school year, the School District received 77.68% ($42,099,342) of its funding from state operating funds; 12.29% ($6,660,051) from federal funds; 7.76% ($4,206,840) from local

property taxes; and 2.27% ($1,229,746) from other local sources. Roughly 22% of Edcouch Elsa's funding comes from non-state sources. The School District's local funding is derived from its power to "levy and collect taxes and issue bonds." Tex. Educ. Code § 11.152. As the Fifth Circuit has noted, because a school district can self-finance, "[t]here is little reason to think the state treasury would be implicated by a judgment against [the school district]." *McAllen*, 62 F.4th at 183; *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (finding school district not entitled to Eleventh Amendment immunity because, even though it received "a significant amount of money from the State [of Ohio]," it had the ability "to issue bonds, and to levy taxes within certain restrictions of state law"). The ability to raise money locally and self-finance makes the School District here "more like a county or city than it is like an arm of the State," and thus weighs against Eleventh Amendment immunity. *Id.*; *see, e.g.*, *Woods*, 466 F.3d at 244 (factor disfavors immunity because "New York school districts are not funded solely by state appropriations; they are also locally funded through property taxes"); *Mission Indep. Sch. Dist.*, 2023 WL 3094185, at *2 (that Mission Independent School District "depends on the state for roughly 72% of its funding" did not favor immunity because "Mission still receives a substantial component of its funding from non-state sources" and because "Mission 'maintain[s] the power to levy certain taxes and issue bonds'").

The fourth factor inquires whether "the entity's function is traditionally one of local or state government." *Mancuso*, 86 F.3d at 293. As noted, independent school districts in Texas "have the primary responsibility for implementing the state's system of public education." Tex. Educ. Code § 11.002. Although "education may be a statewide concern in the abstract," the School District's "day-to-day tasks consist in operating local schools." *McAllen Indep. Sch. Dist.*, 62 F.4th at 184 (cleaned up). The district at issue here, Edcouch Elsa School District,

"serves students in Hidalgo County, not Texans generally." *Id.* The district is thus "a local entity acting for the special advantage of local inhabitants." *Id.* (citation and internal quotation marks omitted). The Circuits relevant here have recognized the local function of education. The Fifth Circuit has held that "school districts meet local rather than statewide needs." *Id.*; *see also McKinney*, 936 S.W.2d at 282 ("At the local level are independent school districts, which have been the 'basis of the public school system of Texas from the days of the Republic'" (quoting *Love v. City of Dallas*, 40 S.W.2d 20, 24 (Tex. 1931)). And the Second Circuit has termed education a "local function" because the state often vests control of it "in boards of trustees that are accountable to local governments rather than the state." *Leitner*, 779 F.3d at 139; *cf. Woods*, 466 F.3d at 247 (finding factor neutral given "long history of shared state and local responsibility for public education"). This factor thus disfavors immunity because the School District serves a local educational function.

The fifth factor inquires "whether the state has a veto power over the entity's actions." *Mancuso*, 86 F.3d at 293. The state statutory scheme suggests that Texas does not have an ultimate veto power over the School District's actions. As noted, the Texas Education Code provides that "the trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district." Tex. Educ. Code § 11.151(b). It further provides that "[a]ll powers and duties not specifically delegated by statute to the [Texas Education Agency] or to the State Board of Education are reserved for the trustees, and the agency may not substitute its judgment for the lawful exercise of those powers and duties by the trustees." *Id.* This suggests that the power reserved for an independent school district ultimately is free from state interference.

Important to the analysis under this factor, although Texas has significant regulatory and oversight power over its school districts, such is short of veto power. To be sure, school districts are subject to state accreditation, academic performance, and financial accountability standards. Tex Educ. Code § 39A.001(1). When districts miss these standards, Texas's Commissioner of Education can take corrective action, including to "appoint a conservator to oversee the operations of the district"; "appoint a management team to direct the operations of the district in areas of insufficient performance or require the district to obtain certain services under a contract with another person"; and "authorize the district to enter into a memorandum of understanding with an institution of higher education that provides for the assistance of the institution of higher education in improving the district's performance." *Id.* § 39A.002(7)–(9). If a district "subject to commissioner action under section 39A.001" has failed to satisfy requisite standards "for two consecutive school years," the "commissioner may revoke the accreditation of a school district" and "order closure of the district and annex the district to one or more adjoining districts." *Id.* § 39A.005(b)(1). But this power applies only when a district has repeatedly failed state standards and where less intrusive interventions have not produced results. The existence of this extreme-case authority is not tantamount to a "veto" over a school district's lawful exercise of its authority. Rather, the Commissioner can only implement these corrective measures when a district *unlawfully* exercises its authority by flouting governing state standards. As such, the Court finds, this factor modestly weighs against immunity, or at best for the School District, is neutral.

The sixth factor inquires "whether the entity's obligations are binding upon the state." *Mancuso*, 86 F.3d at 293. As noted, the School District has not come forward with evidence that money judgments obtained against it bind Texas. On the contrary, the district's "ample funding

from local and federal sources belies the assertion that Texas would be 'directly responsible for a judgment'" against it. *McAllen Indep. Sch. Dist.*, 62 F.4th at 180.  The School District also has not pointed to evidence "that Texas is obligated to indemnify it." *Id.*  And, even if the state treasury would be implicated by a judgement against the district, for the reasons reviewed above, there is no risk that a monetary judgment against the School District will emerge from *this* action, which merely seeks the appointment of an umpire—a third arbitrator—under an agreement entered into by the School District itself.  Because "there is little"—in fact, no— "reason to think the state treasury would be implicated" by the outcome of this litigation, this factor too weighs against immunity. *Id.* at 183 (cleaned up).

The factors under *Clissuras* and *Mancuso* thus both solidly disfavor immunity.  The Court accordingly finds the School District not entitled, in the present litigation, to Eleventh Amendment sovereign immunity.  This result accords with the vast majority of cases, which— even where a litigation implicates monetary relief—have held school districts and school boards not immune under the Eleventh Amendment. *See, e.g.*, *Doyle*, 429 U.S. at 280 (city board of education not entitled to Eleventh Amendment immunity because "a local school board . . . is more like a county or city than it is like an arm of the State," even though the school board "is subject to some guidance from the State Board of Education" and "receive[d] a significant amount of money from the State"; court treats district "as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend" as opposed to "an arm of the State partaking of the State's Eleventh Amendment immunity"); *Woods*, 466 F.3d at 250 (local boards of education not entitled to Eleventh Amendment sovereign immunity); *Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 27 (2d Cir. 1986), *overruled on other grounds*, *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002) (school district not entitled to Eleventh

Amendment immunity); *McAllen Indep. Sch. Dist.*, 62 F.4th at 184 (independent school district and charter school in Texas not entitled to Eleventh Amendment immunity); *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1189 (9th Cir. 2003) (school district in Alaska not arm of state entitled to Eleventh Amendment immunity); *Duke v. Grady Mun. Sch.*, 127 F.3d 972, 981 (10th Cir. 1997) (New Mexico school districts and governing boards not arms of state); *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 871 (3d Cir. 1990) (Pennsylvania school district not entitled to Eleventh Amendment immunity); *Gary A. v. New Trier High Sch. Dist. No. 203*, 796 F.2d 940, 945 (7th Cir. 1986) (school district in Illinois not entitled to Eleventh Amendment immunity).

The Court accordingly denies the motion to dismiss under Rule 12(b)(1).

## IV.    Motion to Appoint Umpire

### A. Authority to Appoint an Umpire

The Insurers petition the Court to appoint an Umpire, as authorized by Section 5 of the FAA, which provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, *or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire*, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein[.]

9 U.S.C. § 5 (emphasis added); *see also id.* § 206 ("Such court may also appoint arbitrators in accordance with the provisions of the agreement."). Noting that the Arbitration Agreement here authorizes either party's arbitrator, upon an impasse, to "request [that] the selection [of an umpire] be made by a judge of a New York court," the Insurers ask this Court to do so, asserting

that the arbitrators have reached an impasse over that appointment. *See Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's London Syndicate 53*, 615 F. App'x 22, 23 (2d Cir. 2015) (impasse exists where "[e]ach party had designated its own pick, whom the other side refused").

The School District disputes, on two grounds, this Court's authority to appoint a neutral umpire.

First, noting that the Arbitration Agreement authorizes the selection "by a judge of a New York court," it argues that a such a court consists exclusively of *state* courts within New York State. Resp. Mem. at 9–10. The argument that this formulation excludes federal courts is in tension with the frequent, albeit informal, usage of that term in various reported federal court decisions, including from the Second Circuit, which have commonly used the term "New York court" to encompass not only state courts but also federal district courts situated in this state. *See, e.g., Off. & Pro. Emps. Int'l Union v. Sea-Land Serv., Inc.*, 210 F.3d 117, 118 (2d Cir. 2000) ("[T]he federal district court for the Southern District of New York (the "New York court") entered a final judgment confirming the award."); *Hadden v. Rumsey Prod.*, 196 F.2d 92, 94 (2d Cir. 1952) ("On January 16, 1950, the judgment creditor forwarded to the Clerk of the United States District Court for the Western District of New York (referred to hereafter as the New York court) an exemplified copy of the Ohio court's judgment for registration in the New York court pursuant to [28 U.S.C. § 1963]."); *In re St. Johnsbury Trucking Co., Inc.*, No. 93-1073 (FGC), 1994 WL 832007, at *1 (Bankr. D. Vt. Nov. 1, 1994) (referring to the "United States Bankruptcy Court for the Southern District of New York" as "New York Court").[7] More apposite, in *City of*

---

[7] There are, of course, cases that have used the term to refer to New York state courts, but they did not do so in a manner suggesting that the term exclusively applied to such courts. *See, e.g., Dorsey v. Apple Computers, Inc.*, 936 F. Supp. 89, 90 (E.D.N.Y. 1996) (referring to New York state courts as "New York courts"); *Schoenefeld v. New York*, 748 F.3d 464, 471 (2d Cir.),

*New York v. Pullman, Inc.*, 477 F. Supp. 438 (S.D.N.Y. 1979), Judge Weinfeld interpreted nearly identical language in a forum selection clause to include federal courts. The language read: "The undersigned bidder also agrees to submit any controversies or problems arising out of this contract to the *New York courts* and the New York courts only." *Id.* at 440 (emphasis added). Judge Weinfeld rejected the City's argument that the clause only "stipulated New York State courts as the forum in which to litigate any suit arising under the contract." *Id.* at 440. "New York courts," he instead held, can be read to mean "both state and federal courts located in the State of New York." *Id.* at 442. The School District has not pointed to contrary authority. The Court here, following Judge Weinfeld, rejects the School District's reading, and finds the term "a New York court" to embrace both state and federal courts located in New York State—including this Court.[8]

The School District next notes that the Arbitration Agreement states that the party-appointed arbitrator was formally required to file this petition. It therefore argues that this Petition must be denied, following which the Insurers' arbitrator could file a mirror-image petition. That argument does not carry the day for the School District, for this reason: Section 5 of the FAA expressly authorizes a party to move for designation of a neutral umpire upon the lapse of the naming of an umpire. As the Second Circuit has explained, "[w]hen an arbitration agreement provides 'a method of naming or appointing . . . an umpire,' Section 5 of the FAA

---

*certified question accepted*, 23 N.Y.3d 941 (2014), *and certified question answered*, 25 N.Y.3d 22 (2015) (referring to New York state courts as "New York courts").

[8] In a separate line of authority involving forum selection clauses, the Second Circuit has noted the "widely-accepted rule" that clauses "that use the term 'in a state' permit jurisdiction in both the state and federal courts of the named state, whereas forum selection clauses that use the term 'of a state' limit jurisdiction over the parties' dispute to the state courts of the named state." *Rabinowitz v. Kelman*, 75 F.4th 73, 84 (2d Cir. 2023) (cleaned up). The Arbitration Agreement here does not use either of these formulations, making this line of authority inapposite.

mandates that 'upon the application of either party to the controversy the court *shall* designate and appoint an . . . umpire' if either (1) 'any party [to the agreement] shall fail to avail himself of such method,' or (2) 'for *any other reason* there shall be a lapse in the naming of an . . . umpire.'" *Odyssey Reinsurance*, 615 F. App'x at 22 (quoting 9 U.S.C. § 5). A "lapse" referred to in Section 5 is a "lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators, or some other mechanical breakdown in the arbitrator selection process," including a "deadlock" in the naming of an arbitrator. *Id.* at 22–23. That circumstance has been established here. It is not disputed that the party-appointed arbitrators have reached an impasse. The Insurers so represent, Pet. ¶ 33; and the School District, far from disputing the point, has disclaimed the need to develop a factual record on this (or any other) point. The factual basis for judicial appointment of an umpire as authorized by the Arbitration Agreement is thus apparent. And, consistent with FAA Section 5, the Insurers, being a "party to the controversy," properly filed an "application" with this Court to designate and appoint an umpire. 9 U.S.C. § 5.

The School District seizes on the fact that the Agreement states that the party arbitrator may request appointment of an umpire. But nothing in that provision purports to limit a party's statutory right under Section 5 of the FAA to do so. And that provision does not limit, or purport to limit, this Court's duty under the FAA to "designate and appoint an . . . umpire" "upon the application of either party to the controversy." *Id.*; *see, e.g.*, *Odyssey Reinsurance*, 615 F. App'x at 22 (reversing district court decision with instructions to "appoint an arbitration umpire" because Section 5 of the FAA so "requires"); *Stop & Shop Supermarket Co. LLC v. United Food & Com. Workers Union Loc. 342*, 246 F. App'x 7, 11 (2d Cir. 2007) ("Notwithstanding the existence of [] a provision [providing for a method of naming or appointing an arbitrator], a district court has the duty under FAA § 5 to step in and appoint an arbitrator if . . . there is a lapse

in the naming of the arbitrator."); *Sprint Commc'n Co., L.P. v. Albany Cnty.*, No. 17 Civ. 01271 (BKS) (CFH), 2018 WL 2390121, at *4 (N.D.N.Y. May 25, 2018) (appointing umpire under Section 5 of FAA); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Source One Staffing LLC*, No. 16 Civ. 6461 (JMF), 2016 WL 5940920, at *2 (S.D.N.Y. Oct. 13, 2016) (same). In any event, the Insurers' counsel, in moving for this relief, has made clear that he is acting with support of the Insurers' appointed arbitrator, Rogers, whom, counsel states, believes that "the party-appointed arbitrators have now reached an impasse . . . despite both arbitrators' efforts to reach an agreement." Greisman Decl. ¶ 21.

### B. Selection of Umpire

The parties together have put forward seven umpire candidates. The Insurers propose three retired magistrate judges of this District: Michael H. Dolinger; Henry B. Pitman; and Kathleen A. Roberts. Greisman Decl. ¶ 16; *id.*, Exs. B–D. The School District proposes three retired Texas state court judges—Deborah G. Hankinson; Mark D. Davidson; Joseph T. Halbach—and Paul J. Van Osselaer, an insurance coverage mediator. Resp. Mem. at 14. The Court finds all candidates qualified to serve as the umpire.

The parties each object to the other's candidates. The Insurers object to the School District's candidates on the ground that they are not expert in New York law, which they contend will, under the Arbitration Agreement, govern the arbitration. *See* Ins. Policy at 48 ("The seat of the Arbitration shall be in New York and the Arbitration Tribunal shall apply the law of New York as the proper law of this insurance."). The School District, while noting that the arbitral panel and not this Court will ultimately determine the governing law, contends that Texas law will apply, favoring its candidates. The choice of law ultimately will be for the panel, not this Court, to decide. But the Court cannot ignore that the Arbitration Agreement lists New York as

the seat of arbitration and states that the panel is to apply New York law. These factors favor an umpire based in New York whose career has made them familiar with New York law. Such a person more likely would be expert in the issues of New York law that the agreement states is to apply.[9] *See, e.g., Certain Underwriters at Lloyd's, London v. Falls of Inverrary Condos., Inc.,* No. 22 Civ. 8612 (VEC), 2023 WL 2784513, at *2 (S.D.N.Y. Apr. 5, 2023) ("Accordingly, the Court limits its consideration to the New York-based candidates" because the "arbitration agreement selects New York law and sets New York as the seat of arbitration."); *In re Arb. Between Nat. Union Fire Ins. Co. of Pittsburgh, P.A. v. Pers. Plus, Inc.*, 954 F. Supp. 2d 239, 250 (S.D.N.Y. 2013) (evaluating umpire candidates' "base of knowledge"); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Beelman Truck Co.*, No. 17 Civ. 2946 (VEC), 2017 WL 3049550, at *2 (S.D.N.Y. July 17, 2017) (choosing candidate who had a "wealth of experience serving as arbitrator[] and umpire[]"). Separately and less importantly, a New York-based umpire can travel more easily, and presents lesser travel and lodging costs, than an out of state umpire. On these bases, the Court finds that the Insurers' candidates, all three former magistrate judges[10] based in New York, are best suited to help resolve this controversy.

The School District also contends that the Insurers' candidates charge excessive fees.[11] The seven candidates charge the following hourly fees:

---

[9] The School District posits that Texas building codes, ordinances, and insurance regulations may be implicated by the dispute. The Court is confident that, to the extent such may prove so, the Insurers' candidates will be up to the challenge of mastering and applying such codes. As federal magistrate judges, all three candidates handled a diverse caseload that often called upon them to familiarize themselves with unfamiliar laws and regulations.

[10] Dolinger served for 31 years; Pitman for 23 years; and Roberts for 10 years.

[11] The Arbitration Agreement provides that "[e]ach party will pay its chosen Arbitrator, and also bear the other expenses of the Arbitration and Umpire equally." Ins. Policy at 48.

| Insurers' Candidates | | School District's Candidates | |
|---|---|---|---|
| Dolinger | $847.00 | Hankinson | $750.00 |
| Pitman | $904.00 | Davidson | $400.00 |
| Roberts | $1,017.00 | Halbach | $600.00 |
| | | Van Osselaer | $800.00 |

Greisman Decl., Ex. E at 3–4. The School District notes that the average hourly fee for its candidate ($637.50) is below that of the Insurers' candidates ($922.67). Although relevant, that concern is overstated. The rates charged by the New York candidates are consistent with norms in this District. And the School District has put forward a candidate, Van Osselaer, whose hourly rate $800/hour is not far below Dolinger's ($847). And, as noted, an umpire who is based in New York is less apt to incur travel and lodging expenses, or incur time learning New York law, than an umpire from out of state. It thus "may be more costly for a [Texas]-based umpire to oversee arbitration proceedings in New York compared to a New York-based umpire." *Falls of Inverrary Condos.*, 2023 WL 2784513, at *2.

All three candidates put forward by the Insurers are superbly qualified. Each enjoys an excellent reputation within this District, for acumen, diligence, probity, and collegiality. Each was well known to this Court as an accomplished, thoughtful, and wise jurist. Each would be well-suited to this assignment.

After considering both parties' objections, the Court selects Michael H. Dolinger as umpire. He has vast experience in dispute resolution. During his 31 years a magistrate judge in this District, he presided over settlement negotiations, pre-trial matters, and trials, in thousands of cases, including insurance disputes. Greisman Decl., Ex. B at 6.[12] His diverse caseload,

---

[12] The insurance disputes over which Dolinger presided as a magistrate judge included: *In re Avon Prods. Inc. Securities Litig.*, 05 Civ. 6803 (S.D.N.Y. July 29, 2005); *In re Global Crossing Inc. Securities and ERISA Litigs.*, 02 Misc. 1472 (Sept. 6, 2002); *In re WorldCom Inc. Securities and ERISA Litigs.*, 02 Civ. 4816 (June 21, 2002); and *In re Omnicom Group Inc. Secs. Litig.*, 02 Civ. 4483 (June 13, 2002). Greisman Decl., Ex. B at 9.

tracking the docket of this District, encompassed complex statutory claims, class action lawsuits presenting complex constitutional and commercial law issues, and lawsuits by individuals claiming unlawful discrimination, violations of employment law, and breaches of contract. *Id.* at 6. He currently serves as a mediator and arbitrator for JAMS, in which capacity he has gained experience and stature as an arbitrator. And, in light of the School District's professed concern about cost, Dolinger bills at an hourly rate below the rates of the Insurers' other nominees. On that basis, the Court finds that, among the Insurers' candidates, Dolinger is best suited to serve as umpire in this arbitration, and that he is a superior choice to the out-of-state candidates urged by the School District. The Court is confident that he will efficiently and effectively serve as an umpire in the arbitration.

## CONCLUSION

For the foregoing reasons, the Court appoints Michael H. Dolinger as umpire. The Clerk of the Court is respectfully directed to terminate the motion at Docket 18 and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: April 8, 2024
New York, New York

24